# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS (Eastern Division)

| | |
|---|---|
| Comcast of Southern New England, Inc. ("Comcast")<br><br>Plaintiff,<br><br>vs.<br><br>Erica Coleman<br><br>Defendant | Case No.: 03-12265-GAO<br><br>**AFFIDAVIT OF PAUL MARMELO** |

Now comes the affiant, and makes this, his sworn statement, under the pains and penalties of perjury, of his own personal knowledge.

1. My name is Paul Marmelo.
2. I am employed by Comcast as an Area Piracy Specialist.
3. I am familiar with the business records of Comcast associated with the Defendant, Erica Coleman.
4. I have been trained and I am familiar with the testing of converters/descramblers to determine if such devices have been modified to receive unauthorized interception of signals.
5. A particular converter/descrambler, bearing serial number JE53ABNQD, was issued by a predecessor in interest of Comcast to the Defendant on August 31, 1999.
6. Converter/descrambler JE53ABNQD was returned to a predecessor in interest of Comcast by the Defendant on December 28, 2000.

7. Shortly after Converter/descrambler JE53ABNQD (hereinafter the "device") was returned to the Plaintiff, I tested the device. The test evidenced the fact that this device had been electronically modified while in the possession of the Defendant so as to allow for the unauthorized reception of secured cable system programming including premium and pay per view channels.

8. This Defendant's account history reveals that the Defendant that only purchased standard, non-premium service while in possession of the device and did not order premium channels or pay-per-view offerings well in possession of the device.

9. Based upon these facts, and absent other evidence, it is reasonable to infer that the device was modified after a device went into the home in August 1999 and was utilized to obtain unauthorized interception of premium channels and pay per view events until the device was returned to the Plaintiff in December 2000.

10. Accordingly, absent any other information, it can be inferred that the duration of the unauthorized interception was approximately 15 months.

11. An individual in possession of a descrambling device would still need to purchase some cable television signals from the Plaintiff in order to allow signals to enter the home and thereafter be descrambled.

12. Additionally, the non-premium cable television stations (e.g. MTV, The History Channel, etc.) are offered to subscribers in groupings of channels ("tiers"). These channels are either delivered in groups to the subscriber in a non-scrambled fashion or they are simply not delivered into the home at all. This also explains why an individual with a descrambling device might still be paying a significant amount to the cable television company while utilizing a descrambler to descramble the

premium channels. If an individual wanted access to all stations that individual would have to pay to have the non-scrambled stations come into the home and then use the descrambling device to scramble the premiums stations and pay-per-view offerings.

33. During the above referenced 15 month period the pricing for standard service ("tiers") varied significantly but taking into account the length of time and the variations in price it is reasonable to state that Defendant was paying *on average* $35.00 per month for his service from the Plaintiff. This service did not include any scrambled premium stations.

34. During the above referenced 15 month period the charge for all of the premium channels that would have been available to the Defendant through the use of the device varied significantly but taking into account the length of time and the variations in price it is reasonable to state that price *on average* was $65.00 per month. This $65.00 figure represents the value of the premium channels the Defendant had access to over and above the non premium stations she was actually paying for.

35. During the above referenced 15 month period the charge for and the number of pay per view movie offerings that were accessible to the Defendant through the use of the device varied significantly but taking into account the length of time and the variations in price it is reasonable to state that price *on average* was $3.95 per movie and there were numerous movies offered per month.

36. During the above referenced 15 month period the charge for and the number of adult pay per view movie offerings that were accessible to the Defendant through the use of

the device varied significantly but taking into account the length of time and the variations in price it is reasonable to state that price *on average* was $8.95 per movie and there were numerous movies offered per month.

37. During the above referenced 15 month period the charge for and the number of special event pay per view offerings (e.g.; boxing or wrestling match) that were accessible to the Defendant through the use of the device varied significantly but taking into account the length of time and the variations in price it is reasonable to state that price *on average* was $30.00 per special event slightly and, on average there was at least one special event per month.

38. Also of assistance in calculating the amount of unauthorized interception is the fact that Comcast did a detailed analysis of its legitimate, paying subscribers in a similar New England franchise as to their pay-per-view purchasing in the month of February, 2003. This analysis showed that a statistically significant number (.17%) of its legitimate, paying, high-end purchasers purchased fourteen (14) or more pay-per-view movies during that particular month.

39. If legitimate, high end, paying subscribers of Comcast purchase fourteen or more pay-per-view movies in a given month it can be inferred that that individuals like the Defendant, utilizing a descrambler without any concern for costs, would also view at least as many pay-per-view movies as the legitimate high end paying subscribers of Comcast.

40. It can also be inferred that that individuals like the Defendant, utilizing a descrambler without any concern for costs, would make a significant number of purchases of the

more expensive adult offerings in addition to or in lieu of to lesser expensive pay-per-view movies.

41. Applying the fourteen pay-per-view movies per month for the prices pertaining to the timeframe involved as to this Defendant and only assuming purchasing pay-per-view movies (as opposed to the more expensive adult pay-per-view offerings) we can infer a reasonable value to the unauthorized interception of pay-per-view movies of $55.30 per month.

42. Taking into account the fact that the Defendant was also receiving $68.00 in premium channels through the use of the descrambling device and inferring that he was obtaining at least $55.30 per month of pay-per-view signals (based upon the high end purchasing statistical analysis referenced above) it is easy to infer that the Defendant was obtaining at least $123.30 in unauthorized interception per month over the above referenced 15 month period of time; for a estimated total of $1,849.50.

Subscribed and sworn to, under the pains and penalties of perjury, this 2 day of MAY, 2005.

_____
Paul Marmelo